STATE, EX REL. C. A. SORENSEN, ATTORNEY GENERAL, V.
STATE BANK OF OMAHA, E. H. LUIKART, RECEIVER,
APPELLANT: CORA WOLF, INTERVENER, APPELLEE.

FILED MARCH 9, 1934.   No. 28803.

*F. C. Radke, Barlow Nye* and *O'Sullivan & Southard,*
for appellant.

*G. F. Nye* and *Leon & White, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and
PAINE, JJ., and BEGLEY, District Judge.

ROSE, J.

This is a proceeding in equity to cancel a guaranty
alleged to have been procured by the State Bank of
Omaha from Cora Wolf by fraud, to repossess securities
pledged by her as collateral for her obligation as guaran-
tor and to require pledgee to account for the income from,
or proceeds of, the collateral pledged.  The guaranty bore

the signature of Jake Spiesberger, Cora Wolf and E. Treller.

In an action to wind up the affairs of the State Bank of Omaha, an insolvent corporation in the hands of E. H. Luikart, receiver, Cora Wolf, intervener, pleaded that, through fraud, she was induced to sign a 50,000-dollar guaranty for payment of past and future debts, however evidenced, owing by M. Spiesberger & Son Company, hereinafter called the "company," to the State Bank of Omaha, hereinafter called the "bank;" that intervener pledged, and the bank received as collateral, notes, mortgages and bonds aggregating in amount and value $25,-000; that, to induce intervener to sign the guaranty and make the pledge, the bank, by its president, falsely stated to intervener that the company had pledged collateral of the value of $25,000 to secure debts owing by the former to the latter; that the collateral so pledged by the company would first be applied to the extinguishment of its obligations to pledgee and that the securities pledged by intervener would only be used in the event the securities pledged by the company would prove to be insufficient; that such statements were false, and intervener believed them and relied on them and was thus induced to sign the warranty and make the pledge; that, as a further inducement, the president of the bank promised to deliver to her the income from the collateral pledged by her; that the company filed a petition in bankruptcy and listed the bank as a creditor in the sum of $34,400, a claim for which was filed in the bankruptcy court January 13, 1931; that the department of trade and commerce took charge of the bank August 10, 1931, and the receiver thereafter threatened to sell intervener's pledged collateral and to apply the proceeds in payment of the bankrupt's indebtedness to the bank; that intervener made a futile demand for the return of her pledged securities.

The receiver denied the fraud charged by intervener and pleaded that her guaranty and pledge were in full

force and effect; that, when the receiver took charge of the bank, the debt owing to it by the company, payment of which had been guaranteed by intervener, was $34,400; that upon payment thereof the receiver would surrender the collateral in his possession and account for money already realized from pledged securities. The receiver prayed for an accounting to determine the amount due on intervener's guaranty, for judgment therefor, and for authority to sell the collateral and apply the proceeds on the judgment, if not paid when directed by the court.

A reply put in issue the facts on which the receiver based his prayer for relief.

Upon a trial of the cause the district court found all the issues in favor of Cora Wolf, intervener; canceled the guaranty for fraud; ordered the receiver to return to intervener her securities in his hands; directed payment of proceeds of her collateral in the sum of $18,960 to her as a trust fund in the receiver's hands. The receiver appealed.

The finding that intervener was induced by fraud of the bank to sign the guaranty and to make the pledge is vigorously assailed as erroneous. The principal witnesses who testified on this issue were Cora Wolf, intervener, and Albert L. Schantz, president of the bank. Their testimony is in direct conflict on the crucial point. Who told the truth? The district judge who believed intervener saw and heard the witnesses. The appellate court is deprived of that advantage and, on a trial *de novo*, may consider the fact that the court below gave credence to the witness Cora Wolf rather than to the witness Schantz, their testimony being in conflict. *Broeker v. Day,* 124 Neb. 316; *Maryland Casualty Co. v. Geary,* 123 Neb. 851.

The company was a corporation which had been engaged in the wholesale millinery business in Omaha for 30 years. Jake Spiesberger, a brother of Cora Wolf, was an executive officer and manager of the company. Other Spiesbergers were also interested in it. The company

wanted credit and Jake arranged with Schantz, president and manager of the bank, for loans, when needed, to the extent of $50,000. The bank was closed on account of insolvency August 10, 1931, when its unpaid loans to the company were $34,400. The company went into bankruptcy December 4, 1931. Intervener signed the guaranty for $50,000 February 8, 1926, and pledged as collateral $25,000 in bonds secured by mortgages on real estate. She testified she had a conversation on that date with Schantz in his office in the bank and that they were the only persons present. Referring to what then and there occurred before she signed the guaranty she said:

"I went down to the bank and went into the little room and talked with Mr. Schantz and he had these papers for me to sign, and I asked him how I was going to be protected. He told me that he had $25,000 in securities from Spiesbergers; he had them, and that they would be used first in case it would be needed before they would take mine."

Uncontradicted evidence proved that the bank did not then have or thereafter acquire from the company $25,000 in collateral. Cora Wolf's testimony tends to prove the following facts: Schantz was president and head of the bank. She believed his statements were true and relied on them. She would not have signed the guaranty except for his statements. She had not owned any stock in the company for 20 years; never signed any notes payable to it; never was at the bank at any other time. Her securities were there when she arrived. Jake had told her the company had deposited $25,000 in securities and for her to go to the bank and sign the papers. Her pledged securities were all the property she had except her residence. She lived on the income from the bonds pledged, having received the interest thereon indirectly from the bank through the company after she signed the guaranty. Two weeks after the bank closed she first learned that the company had not deposited $25,000 in securities.

Schantz was a witness for the receiver of the bank and told a different story. He said Jake prepared and signed the guaranty before Cora Wolf came to the bank, where the papers had been left. Her part in the transaction was narrated by Schantz as follows:

"Mrs. Wolf came to my desk, and said that she had come into the bank to sign the papers that Jake, her brother, had sent her up there to sign, and I took her in my private office and gave her the assignments on the mortgages and the guaranty which she signed. There was no other conversation."

On the witness-stand Schantz denied he made the statements to which intervener testified. He said in substance that he did not tell intervener the bank had received collateral from the company or its officers and denied that he told her the company's collateral would be exhausted before resorting to her pledged securities; that she voluntarily signed the guaranty and the assignments of her pledged paper. If credence is given to his testimony it proves that the guaranty was not procured by fraud.

Some of the circumstances surrounding the transactions seem to strengthen intervener's testimony. Willard L. Idell, an officer of the bank when the guaranty was signed, testified that as a rule collateral for credit was required in approximately the amount of loans. Had this rule been followed, the bank would have exacted $50,000 in collateral. On the date of the guaranty, February 8, 1926, Jake Spiesberger and Mayer Spiesberger, stockholders of the company, in consideration of loans, assigned to the bank any claim either might have or acquire against the company, and this assignment, without indicating any value, was accepted by the bank as collateral security. December 27, 1927, Jake Spiesberger assigned, and the bank accepted as collateral, a claim without any indication of amount or value and a 5,000-dollar note. The evidence does not show that this collateral was of any value.

An effort was made to impeach intervener's testimony

to the effect that she pledged to the bank as collateral all her property except her residence, but there is nothing to show that she retained for herself any property of any kind from which she derived an income. In this situation, before the signing of the guaranty, it would not be unreasonable to infer that she would be prompted to engage Schantz in conversation and to ask him how she was to be protected in trusting to the bank her means of support. If he followed the rules of the bank, it would have had, or would acquire, $25,000 in collateral in addition to her own. In this situation it would not be unreasonable for the banker to say to a guarantor without legal knowledge that collateral of the principal debtor would be first exhausted.

It seems clear that intervener did not part temporarily with all her interests in the pledged securities, since she continued to receive the interest thereon through the bank and the company.

In view of all the testimony, of the surrounding circumstances and of the credence which the trial judge gave to intervener as a witness after having seen and heard her and other witnesses as they testified, the conclusion is that the guaranty was procured by fraud as charged in the petition, that it was properly canceled, and that securities and proceeds belonging to intervener in the hands of the receiver were restorable to her in equity as trust property.

Though the cause was tried before the district court without a jury, each of 40 assignments of error is directed to a ruling on evidence. They do not require separate rulings or reasons. Most of them apply to the sustaining of objections to questions propounded to witnesses. Many of the questions called for collateral facts within the discretion of the trial court to reject as evidence. Others were objectionable as argumentative. The answers to many more would not have thrown any light on any controverted issue. Some were immaterial. As to the re-

mainder of the questions, the facts which the receiver offered to prove, if admitted, would not have required a different result on the merits of the controversy. Prejudicial error in the rulings on evidence has not been pointed out or found. In view of the conclusions reached, the judgment of the district court is

AFFIRMED.